2025 UT App 51

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHRISTOPHER JAMES AUSTIN,
Appellant.

Opinion
No. 20240034-CA
Filed April 10, 2025

Second District Court, Ogden Department
The Honorable Craig Hall
No. 221901367

Emily Adams, Rachel Phillips Ainscough, and
Anna Grigsby, Attorneys for Appellant

Derek E. Brown and Michael Gadd,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and
DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1 After chatting online with a person for several days, Christopher James Austin drove to a park to meet up with that person and to engage in sexual activity with that person and that person's thirteen-year-old cousin. But the person turned out to be an undercover police officer. A jury later convicted Austin of two counts of attempted sodomy on a child. Austin appeals his convictions, asserting that there was insufficient evidence to support a finding that he took a substantial step toward the commission of the charged crimes. We reject Austin's arguments and affirm his convictions.

BACKGROUND[1]

¶2     In May 2022, a special agent (Agent) for the Utah Internet Crimes Against Children Task Force was conducting a sting operation. Working undercover, Agent opened an account on a social networking and dating app; he named his account "TabooDadNoLimit," a name designed to attract people interested in underage sexual activity, and he created a profile for a fictional twenty-five-year-old male. Because the app takes steps to ban accounts that it suspects are being used to facilitate underage sexual activity, Agent testified that he endeavors to move conversations from the app to text messaging as quickly as possible once someone responds favorably to discussions of underage activity. Agent explained that, in most instances when the topic of underage sexual activity comes up, app users will immediately cease communication, and in some cases they will even report the activity to the app or to law enforcement.

¶3     Austin had an account on the app under the moniker "Kink & Taboo." First contact between Austin and Agent occurred on May 13, 2022, when Austin sent Agent a message saying simply, "Hey." After Agent tested the waters with, "I hope [you're] into what I am," Austin responded, "I bet I am," and the two quickly transitioned off of the app and on to text messaging. Agent texted Austin that his "biggest kinks are incest and underage," to which Austin replied, "Same man," and then volunteered that he was also interested in "rape." When Austin asked Agent if he had any experience with incest, underage sex, or rape, Agent responded that he lived with his "13-year-old cousin" (Cousin) and that the two of them "do stuff all the time." Austin reacted, "Dude, that's so hot. I bet he's so tight." Austin then asked Agent whether he

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Layton City v. Carr*, 2014 UT App 227, ¶ 2 n.2, 336 P.3d 587 (cleaned up).

had experience with rape; Agent responded, "That could be super fun with [Cousin]," and Austin replied, "Yeah, I bet it would. Would he let you do that to him?" Agent suggested that Austin could rape Cousin while Agent watched, and Austin wrote back, "God, I'd kill to see that." Agent then offered to meet up that evening, but Austin showed concern that Agent might be a police officer, asking, "How do I know I'm not going to get arrested?"

¶4 After Agent assuaged Austin's fear, Austin continued the conversation. Austin asked for pictures, and Agent sent an actual current photo of himself, as well as an "age-regressed" photo of himself—created with "software that age regresses photos"—intended to depict a thirteen-year-old boy. Agent told Austin that the photo of the boy was of Cousin. Austin then asked Agent if he had any photos of "you in him," but Agent declined, saying, "We don't share that. We don't want to get in trouble." Austin then asked if he could watch Agent have sex with Cousin, and Agent responded by asking whether Austin wanted to "join in." But Austin responded, "Not tonight."

¶5 The next day, Austin reinitiated contact. Agent did not readily respond, and over the next few days Austin repeatedly tried to communicate with Agent, attempting to initiate contact at least eight different times. Eventually, on May 22, Austin texted Agent that he "need[ed] some teen cock bad." Agent offered, "My cousin is 13 and we can have a threesome with him," and Austin responded that he was free the following night. But when Agent tried to solidify the plan, Austin went silent.

¶6 Two days later, on May 24, Austin reached out to Agent again with a simple "Hey." Agent responded by giving Austin an "out," which is a term Agent used to describe "opportunit[ies]" officers try to give to individuals "to distance themsel[ves] from the situation, to say no, to go away." In this instance, Agent said, "I'm so sick of you wasting my time over and over. Go away."

¶7 But Austin re-engaged the conversation, calling Agent's response an "overreaction." Agent apologized for the "overreaction" but brought the focus back to Cousin, explaining that Cousin was "bummed" that Austin went silent because he "was especially excited for [Austin] to come over." Agent later testified that he said this because he "wanted it to be very, very clear, that if [Austin] shows up, he's not showing up for just a consensual encounter with an adult." After further discussion, Austin sent a photo of himself without his shirt so that Agent could "decide" if he still wanted "to make plans." Austin said, "If we meet up I'd like to meet just you first. What we are talking about could seriously fuck up my life if it went sideways." Agent responded by offering Austin another out: "Sorry man that's just not what we're looking for. If you aren't comfortable with this I understand, we will just find someone else." Austin replied, "There's just still a part of me that worries this is a setup." Agent reassured him jokingly that "this would be the most elaborate and long-term setup ever," but extended Austin another out, stating, "If you're not comfortable with it, that's ok."

¶8 But Austin continued the conversation: "If we did it what are the rules?" Agent said, "The only rules I've made with other guys that come over are safety related. If something is hurting him, gotta stop, just be gentle with him things like that." Austin replied by stating that was "fair" and by asking whether Cousin "only bottom[ed]," a question Agent interpreted as asking whether Cousin would only be interested in receiving sexual penetration. Agent answered, "No, he's pretty versatile." "Perfect," Austin texted, "I want to watch you with him, too." Austin also asked Agent, "When did you last fuck [Cousin]?" Agent responded, "3 nights ago," and Austin replied, "Hell, yeah. I'd watch you every night if you'd let me." Austin then asked, "What's the most extreme thing you've done with/to your cousin?," and followed that question with, "Damn, what would it be like to have a 13-year-old hole and cock available to you all the time." After Agent responded, "It's pretty awesome," Austin

asked, "How big is his cock?" After Agent responded with a measurement, Austin wrote, "Mmmmmm, I want him in me. I bet his cum tastes amazing." Later that night, Austin told Agent, "I want your cousin's loads," a term Agent understood to be a reference to Cousin's semen.

¶9      The next day, May 25, Austin and Agent discussed setting up a time and place where they could have a threesome with Cousin. Austin twice asked Agent if he and Cousin wanted to stop by his apartment in Salt Lake County, but Agent declined, saying that he wasn't comfortable "taking [Cousin] somewhere [Agent was] unfamiliar with." Instead, Agent invited Austin to his "uncle's" apartment in Weber County where Agent said he and Cousin would be "house-sitting." At this point, Agent provided another out, telling Austin that if he wasn't "comfortable with that it's totally ok." Austin responded, "I may come up to Weber tomorrow night," and Agent said, "That would be way fun. But again, I don't want you to feel pressured at all."

¶10     The conversation continued. Austin asked Agent if he had "showed [Austin's] pics to" Cousin, and Agent responded, "Absolutely. I showed the pic you sent yesterday and he said he loves how hairy you are." Later in the discussion, Agent asked Austin point-blank, "What would you and [Cousin] do while I watched? . . . I wanna hear." Austin responded, "Maybe you'll just have to wait and see." When Agent pressed, "I actually want to hear you say it," Austin responded, "Well, what I've been fantasizing a lot about is eating his ass out and making him moan like crazy." Austin continued, "When he's hard and throbbing, I want him to fuck me doggy while I suck your cock," and "[m]aybe he can warm me up and you can use his loads as lube." Austin added, "I hope you two will enjoy my holes enough to want to use them again."

¶11     At this point, Agent offered Austin yet another out: "If you're serious about this, then we're totally open to you coming

through tomorrow. But like I said, I just don't want to pressure you. It's totally up to you." Austin replied, "Yeah, I think I want to meet," but he asked Agent whether it would be "totally safe." After Agent responded that "there [was] nothing to worry about," Austin agreed to meet Agent and Cousin the following evening. Austin said that he was "very excited" for their encounter.

¶12 The next day, May 26, Austin and Agent continued to discuss the details of the planned meeting. After talking about their careers and hobbies, Austin said, "It's been a while since I've been this excited to meet with a guy," to which Agent replied, "Well, it's because it's not just me you're going to have fun with." Austin responded that he was "definitely excited, and very nervous, for that." At this point, Agent provided another out: "Like I said, if you're not comfortable with it, I totally understand. You don't have to do anything you don't want to do." Austin replied, "Well, let's see what happens. At a minimum, I want to come hang out with you guys tonight." Agent then gave Austin yet another out: "I understand, but we're looking for group stuff, so if you don't want to, we kind of want to find someone who does." Austin responded that "wanting to [was] not the issue," and explained, "I don't want to hurt [Cousin]. I don't want this experience to be something he has to reprocess in therapy at some future date." After Agent assured Austin that Cousin "genuinely enjoys it," Agent extended yet another out: "But again, if you don't want to I understand. Just let me know so I can try to find someone else, we are both wanting play time." This time, Austin considered taking the out, telling Agent to "go ahead and try to find someone else." Agent responded by telling Austin that he'd "developed a connection with" him and that he should "think about" the meet up with Cousin and "let [him] know" what he decides. Later that day, Austin replied, "I'll come."

¶13 Austin told Agent that he would leave his apartment at 7:30 p.m. and that it usually takes an hour to drive to Weber County. When Austin asked for the address of the meet-up

location, Agent responded that "it's some townhomes right by" a park and that they should "meet at the park" because he did not "want to give an exact address of where [they were] going to sleep until [they had] met in person." Turning to their plans for the evening, Agent asked Austin if it was "ok if [they took] turns watching," a question Agent later testified was intended to convey "very clearly" to Austin "that if he shows up, he will be sodomizing a child." In response, Austin said that he didn't "mind taking turns watching." A few minutes later, Austin sent a photo of himself to Agent where his chest hair was exposed, and told Agent, "You should blow a load in[to] it," and stated that he wanted his chest hair "wet and matted with cum." Agent asked, "Mine or [Cousin's]?," and Austin responded, "Both." Austin and Agent had discussed Austin potentially spending the night, and Austin stated that he "wouldn't mind if either of [them] needed a midnight release either," a phrase Agent understood to mean an additional ejaculation. Anticipating the evening, Austin said, "All I can think about is you two."

¶14   As the evening progressed, Austin texted Agent updates before their meeting, stating that he was "jumping in the shower" and, later, "leaving now." As Austin made the hour-long drive from his residence to Weber County, he asked, "So are you just going to be waiting at the park for me when I get there, and then we'll head over to your uncle's house?," to which Agent replied, "There are townhomes that back up right to the park. We are in those, so just text me when you get there, and I'll head out and get you." Austin again expressed fear that this was a sting operation, texting Agent, "Will you reassure me one more time and tell me that you are not a cop and this is not a setup?" Agent responded with a final out: "I really am not a cop, but if you don't want to do this I totally understand. Like I said I don't want you to feel pressured into anything." Austin responded, "I do and I'm on my way." Austin also stated, with a winky emoji, that he had "brought a toy." Agent then asked, "Who are you going to use it on?," and Austin replied that he would use it on Agent's penis,

and when Agent followed with "Just mine?," Austin replied that the toy "might be too big for either of ours." A few minutes later, Austin arrived at the park and texted Agent, "I'm here."

¶15     Officers arrested Austin at the park. They discovered that Austin had brought with him condoms, sexual lubricant, and a sex toy. After a few days, the State charged Austin with two counts of attempted sodomy on a child, later explaining to the jury that one of the counts was for "attempting to perform sodomy on" Cousin and that the other was for "attempting to receive sodomy from" Cousin.

¶16     Eventually the case proceeded to trial. In support of its case, the State called as witnesses three law enforcement officers, including Agent, who testified as to the events described above. Agent also testified regarding his undercover experience, provided insight on certain expressions that connote specific sexual acts or expressions that are commonly used by persons interested in underage sexual activity, and testified regarding the methods he employs to filter out persons who are not interested in such activity. The State also introduced screenshots of Austin's conversation with Agent on the app and via text message.

¶17     After the State presented its case, Austin made a motion for a directed verdict, arguing that the State failed to present sufficient evidence that Austin took a substantial step toward committing the charged crimes. Austin argued that "going to a park and meeting up with an officer and nothing more is not a substantial step," and he attempted to distinguish this case from a situation in which a person had met someone at a hotel, had taken off his clothing, and "was told that the juvenile was in a bedroom, go in that other bedroom." The trial court denied Austin's motion, concluding that the State had presented sufficient evidence for the case to be submitted to the jury.

¶18     After that, Austin testified in his own defense. He told the jury that he had been sexually assaulted ten years earlier and that

he coped with that assault by developing a "kink called consensual nonconsent where a person consents to engage in a rape role play." He testified that his discussions with Agent were role plays and that he did not believe his conversations with Agent were real, but were instead fantasies. Austin testified that he felt "manipulated" by Agent, that he liked the attention from Agent, and that he only made statements such as, "I need some teen cock bad" to get Agent's attention because he believed that is what Agent "wanted to hear." He also testified that if he had seen Agent with a thirteen-year-old at the park, he "would have made some excuse and left, if not just driven off right then." Austin testified that he had no intent to commit a crime against a child.

¶19 After deliberation, the jury found Austin guilty of both counts of attempted sodomy on a child. The trial court later sentenced Austin to prison.

ISSUE AND STANDARD OF REVIEW

¶20 Austin now appeals his convictions, and he raises a single issue for our review: he claims the evidence was insufficient to support his convictions and asks us to reverse the trial court's decision to deny his motion for a directed verdict. In considering such motions, "trial courts are not free to weigh the evidence and thus invade the province of the jury, whose prerogative it is to judge the facts." *State v. Samora*, 2021 UT App 29, ¶ 47, 484 P.3d 1206 (cleaned up), *aff'd*, 2023 UT 5, 529 P.3d 330. "Rather, the court's role is to determine whether the state has produced believable evidence on each element of the crime from which a jury, acting reasonably, could convict the defendant." *Id.* (cleaned up). "We review a trial court's ruling on a motion for directed verdict for correctness." *State v. Gonzalez*, 2015 UT 10, ¶ 21, 345 P.3d 1168. And in reviewing a decision denying "a motion for directed verdict based on a claim of insufficiency of the evidence," we will uphold that decision "if, when viewed in the light most favorable to the State, some evidence exists from which a

reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Samora*, 2021 UT App 29, ¶ 20 (cleaned up).[2]

ANALYSIS

¶21   Austin argues that the trial court erred in denying his motion for a directed verdict, and he asserts that his actions did not indicate an intent to commit sodomy on a child and that, therefore, his actions did not constitute a "substantial step" toward the commission of the crimes. We disagree.

¶22   In this case, Austin was charged with, and convicted of, attempted sodomy on a child. Under Utah law, "[a]n actor commits sodomy on a child if: (i) the actor engages in any sexual act upon or with another individual; (ii) the individual is younger than 14 years old; and (iii) the sexual act involves the genitals or anus of the actor or the individual and the mouth or anus of either the actor or individual." Utah Code § 76-5-403.1(2)(a).

¶23   Utah's attempt statute instructs that "a person is guilty of an attempt to commit a crime if he: (a) engages in conduct constituting a substantial step toward commission of the crime; and (b) intends to commit the crime." *Id.* § 76-4-101(1). In this context, our legislature has determined that "conduct constitutes

_____

2. The State asserts that Austin's arguments are not properly preserved for our review because those arguments center on the intent element of the attempt crime, not the substantial step element, which was the focus of the directed verdict motion. Because this case can be resolved on its merits in the State's favor, we address the alleged error without analyzing whether the issue was preserved. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation.").

a substantial step if it strongly corroborates the actor's mental state." *Id.* § 76-4-101(2). Thus, the "substantial step" element and the "intent" element are "closely linked." *State v. Groce*, 2024 UT App 166, ¶ 47, 560 P.3d 200 (cleaned up), *cert. denied*, March 20, 2025 (No. 20251084). Our supreme court, in interpreting the attempt statute, has explained that a substantial step requires "significant conduct" in the form of an "overt act." *State v. Arave*, 2011 UT 84, ¶ 30, 268 P.3d 163 (cleaned up). And that act must be "something more than mere preparation"; it must be "a tangible step toward commission of a crime that transcends intent, yet fails to culminate in its planned accomplishment." *Id.* (cleaned up).

¶24 Thus, in order to obtain a conviction in this case, the State was obligated to prove, beyond a reasonable doubt, that Austin had taken a substantial step—that is, significant conduct in the form of an overt act that strongly corroborated his intent—toward committing sexual acts that involved both (a) either his own or Cousin's genitals or anus and (b) either his own or Cousin's mouth or anus.

¶25 Our supreme court, in *State v. Smith*, 2024 UT 13, 548 P.3d 874, recently offered useful guidance on when a defendant's actions constitute a substantial step within the context of an internet sting operation. There, the court held that a defendant had taken a substantial step toward the commission of various sex crimes, including sodomy on a child, when he showed up to a designated meeting place after arranging to have oral sex and intercourse with an undercover agent posing as a thirteen-year-old girl. *Id.* ¶¶ 14–33. The agent engaged the defendant through a mobile messaging app, and through a series of text messages over the course of three hours, the defendant agreed to drive the girl from Utah to California in exchange for oral and vaginal sex. *Id.* ¶¶ 3–6. The two were to meet at a convenience store, the defendant would flash his lights to signal where his car was located, and soon after driving away, the girl would perform oral sex on the defendant. *Id.* ¶ 6. The defendant drove to the store,

texted his location to the girl and told her to get into his car, and flashed his lights. *Id.* ¶¶ 6–7. The defendant was then arrested by law enforcement. *Id.* ¶ 7.

¶26 These actions, the court held, "strongly corroborate [the defendant's] intent to commit" the charged crimes. *Id.* ¶ 29.[3] The court explained that the text messages "make it clear that he agreed to give [the girl] a ride to California only because she promised to perform sex acts, oral sex among them," and that "[t]hose same messages indicated that he planned to have [the girl] start performing oral sex upon him as soon as they had 'start[ed] driving.'" *Id.* ¶ 30. Analyzing whether the defendant's actions constituted a substantial step, the court explained that while "[t]here are certainly many reasons why someone would drive to a convenience store, . . . [the defendant] drove to the arranged store, at the arranged time, and gave the arranged signal," and "[t]here is no plausible reason why he would do so other than to carry out the arranged plan." *Id.* ¶ 29. The court concluded that the defendant's actions corroborated his intent to commit sodomy on a child. *Id.* ¶ 30.

¶27 Like the defendant in *Smith*, Austin committed a series of overt acts that strongly corroborated his intent to commit sodomy on a child. As in *Smith*, the State here provided text messages between the agent and the defendant involving discussion of specific acts that fall within the ambit of the statutory definition of sodomy on a child. Specifically, the State provided texts from Austin describing his intent to perform acts involving both (a) either his own or Cousin's genitals or anus and (b) either his own or Cousin's mouth or anus. *See* Utah Code § 76-5-403.1(2)(a)(iii); *see also supra* ¶¶ 3–5, 8, 10–14. And like the defendant in *Smith*,

---

3. Although the supreme court analyzed the child kidnapping statute in this part of the opinion, it later stated that "[t]he same logic governs our analysis of the crime of attempted sodomy upon a child." *State v. Smith*, 2024 UT 13, ¶ 30, 548 P.3d 874.

Austin drove to a designated meet-up location where he anticipated facilitating a sexual encounter with a child. Indeed, like the *Smith* defendant's plan to receive oral sex from the girl after starting their drive to California, Austin planned to engage in sexual activity with Cousin at a nearby residence soon after meeting Agent at the park.

¶28 Viewed against the backdrop of Austin and Agent's text-message conversation, Austin's arrival at the park went beyond "mere preparation" for the crime and amounted to "significant conduct" in the form of an "overt act." *Arave*, 2011 UT 84, ¶ 30 (cleaned up); *see also Smith*, 2024 UT 13, ¶ 30 (viewing the defendant's arrival at the meet-up location in the context of the defendant's communications with the undercover agent). Here, as the undercover agent had done in *Smith*, Agent carefully controlled for any misunderstanding Austin may have had that the meet-up was simply to "hang out" with Agent and Cousin, or that the meet-up would involve a sexual encounter with Agent alone. For example, early in the conversation, Austin asked whether he could meet Agent alone first, because the activity with Cousin "could seriously fuck up [his] life if it went sideways." But Agent responded unequivocally: "Sorry man that's just not what we're looking for. If you aren't comfortable with this I understand, we will just find someone else." Then later, when considering whether to meet up, Austin equivocated, saying, "[L]et's see what happens. At a minimum, I want to come hang out with you guys tonight." But Agent rejected the suggestion: "[*W*]*e're* looking for group stuff, so if you don't want to, *we* kind of want to find someone who does." (Emphasis added.) At another point in the conversation, when Austin mentioned that it had "been a while since [he was] this excited to meet with a guy," presumably referring to Agent alone, Agent responded by bringing Cousin into the mix, "Well, it's because it's not just me you're going to have fun with." Austin's response: "I'm definitely excited, and very nervous, *for that*." (Emphasis added.)

¶29    Indeed, Agent later testified that his communications were intended to convey "very clearly" to Austin "that if he shows up, he will be sodomizing a child," and to ensure that Austin would not think he was "showing up for just a consensual encounter with an adult." Toward this end, Agent interspersed clear "outs" at several points during their conversation, making clear to Austin that the evening would entail sexual activity with Cousin and assuring Austin that it was "ok" to decline if he didn't feel "comfortable" with any of it. Austin clearly understood the implications of the meeting; indeed, he conveyed his fear of law enforcement involvement repeatedly throughout the conversation. *See supra* ¶¶ 3, 7, 14. Yet despite Agent's clarifications, warnings, and outs, Austin continued the conversation and persisted with the plan to meet in person.

¶30    In sum, Austin indicated a clear intent to participate in an evening of sexual activity involving Cousin, and Austin followed through by showing up at the park with condoms, lubricant, and a sex toy in tow, thus taking a substantial step toward committing sodomy on Cousin. In support of this conclusion—as well as the other elements of the offense—the State provided ample evidence, and in our view a jury could reasonably find each element of attempted sodomy on a child proved beyond a reasonable doubt.

¶31    Austin resists this conclusion by arguing three points. First, he tries to distinguish *Smith* on procedural grounds, pointing out that the State in *Smith* had a lower burden of proof at the bindover stage than the State had here in resisting Austin's motion for a directed verdict. Second, Austin argues that he lacked causal proximity to the crime—that he was too far removed from the completed offense—because he had arrived at a park and not at a residence or hotel where the crime would occur. Finally, Austin focuses on the content of the text messages sent and received on the day of the meet-up, and he asserts that the messages from that day corroborate only an intent to engage in lawful activity with Agent, not with Cousin, and Austin repeats the same argument to

explain away the condoms, lubricant, and sex toy. For the reasons discussed, each of these arguments fail.

¶32   First, Austin attempts to cabin *Smith* on procedural grounds, explaining that the *Smith* case involved a question of bindover. *See* 2024 UT 13, ¶¶ 8, 12. On this point, it is true that the relevant standard to obtain a bindover is "probable cause," whereas the burden to withstand a motion for a directed verdict requires evidence from which a jury could conclude that the crime had been committed beyond a reasonable doubt. *See State v. Garcia*, 2017 UT 53, ¶ 62, 424 P.3d 171; *Bountiful City v. Swenson*, 2024 UT App 133, ¶ 14, 557 P.3d 1158. The State's burden to obtain a bindover has been described by our courts as a "low bar." *Smith*, 2024 UT 13, ¶ 32 (cleaned up); *see also State v. Jones*, 2016 UT 4, ¶ 12, 365 P.3d 1212 (describing the State's burden at a preliminary hearing as "light"); *State v. Ramirez*, 2012 UT 59, ¶ 9, 289 P.3d 444 ("Although the guarantee of a preliminary hearing is fundamental, the evidentiary threshold at such [a] hearing is relatively low."). It is also true that the procedural posture in *Smith* was relevant to the court's analysis; indeed, the court indicated that it arrived at its decision "in large part because of the legal posture in which th[e] issue arrive[d]." 2024 UT 13, ¶ 32.

¶33   But despite the procedural differences between this case and *Smith*, in our view *Smith* is still useful here to illustrate the sort of activity that can constitute a "substantial step" toward commission of a crime in internet sting cases. And regardless of any difference in procedural posture between this case and *Smith*, the State in this case provided sufficient evidence from which a jury could find beyond a reasonable doubt that Austin took a substantial step toward committing sodomy on Cousin. "A trial court is justified in granting a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, there is *no competent evidence* that would support a verdict in the non-moving party's favor." *Garcia*, 2017 UT 53, ¶ 62 (emphasis added) (cleaned up). And as discussed above, the State's

substantial step evidence included the following: text messages between Austin and Agent discussing plans to sodomize Cousin in very specific ways; Agent's testimony about his experience catching sexual predators through internet sting operations; Austin's arrival at the designated meet-up location near the residence where the sexual acts were to occur; and the fact that Austin brought condoms, lubricant, and a sex toy to the meet-up location. When construing all of this evidence in the light most favorable to the State, we cannot conclude that there is "no competent evidence that would support a verdict" of Austin's guilt beyond a reasonable doubt. *Id.* The fact that the court in *Smith* applied a somewhat different evidentiary standard does not change our analysis.

¶34    Second, Austin claims that he lacked causal proximity to the completed crime. Specifically, he argues that the plan to meet at the park left certain steps remaining before any sexual acts were to occur, thereby introducing doubts about whether Austin's actions corroborated an intent to go through with the offense. In making this argument, Austin tries to distinguish *Smith* on substantive grounds, arguing that, unlike *Smith*—where the defendant anticipated oral sex soon after the fictitious victim was to enter the defendant's car, *see* 2024 UT 13, ¶ 30—the illicit plans at issue in this case were to come to fruition at a nearby residence, not at the park or in Austin's car. In turn, Austin argues that the remaining steps—including meeting Agent at the park, walking over to the residence, and undressing in preparation for the encounter—made Austin's completed actions ambiguous as to his ultimate intent. In other words, Austin posits that—even if one assumes that he drove to the park with the intent to engage in sexual activity with Cousin—he could have changed his mind at some point after his arrival at the park but before the moment he was to actually engage in the illicit activity.

¶35    But at its core, the physical proximity argument that Austin advances here is not materially different from the argument our

supreme court rejected in *Smith*. 2024 UT 13, ¶ 33. There, the court explained that "the attempt statute doesn't mention physical proximity," and it noted that even though many "attempt cases involve a defendant who completed their substantial step in physical proximity to the place where the crime was to occur," applying a physical-proximity "gloss to the statute would complicate prosecutions for attempt crimes where target location is an ambiguous concept, such as attempted tax evasion." *Id.* Moreover, we note that implication of a physical proximity requirement runs contrary to the "overwhelming majority of courts in other jurisdictions [that] have concluded that individuals caught in internet sex stings, and who travel to an agreed-upon meeting place in anticipation of sexual behavior with a fictitious victim, have taken a substantial step toward commission of sexual crimes." *State v. Smith*, 2022 UT App 82, ¶ 18 & n.9, 514 P.3d 620 (collecting cases), *aff'd*, 2024 UT 13. Furthermore, we observe that, in this case, Agent and Austin had arranged to meet at the park and then immediately walk over to the residence where Austin believed he would engage in illicit activity with Cousin; no other plans separated Austin's arranged meet-up with Agent from the planned activity with Cousin at the nearby residence. Under such circumstances, we discern no lack of causal proximity to the completed crime.

¶36 Finally, Austin argues that the content of the texts on the day of the meet-up corroborates only an intent to engage in lawful activity with Agent, and not illicit activity with Cousin. Specifically, Austin claims that the graphic texts discussing Cousin—most of which were shared with Agent in the days leading up to the meet-up—reflected mere "fantasies," and he asserts that his actions therefore fall short of corroborating an intent to engage in illicit activity with Cousin. Austin concludes that "[a] sexual fantasy is not a crime."

¶37 Yet Austin's "mere fantasy" argument overlooks the evidence of Agent's careful attempts to weed out persons who are

merely interested in expressing fantasies or who are interested in actual sexual activity only with an adult. In addition, Austin's argument ignores the texts sent and received on the day of the meet-up, some of which clearly discuss specific activity with Cousin. On the day Austin drove to the park, he expressed a sober concern for Cousin's well-being in light of the plans he discussed with Agent. Austin texted Agent, "I don't want to hurt him. I don't want this experience to be something he has to reprocess in therapy at some future date." This concern for Cousin's welfare is more grounded than a mere sexual fantasy, indicating not only that Austin believed Cousin was real but also that Austin recognized the tangible harm Cousin could suffer as a result of the planned activity. And *after* Austin conveyed this sentiment about Cousin's welfare, Austin then proceeded to discuss with Agent plans to engage in sexual activity with Cousin: that Austin wanted Agent and Cousin to ejaculate onto him, that Austin didn't "mind taking turns watching" the sexual activity with Cousin, and that Austin would be available to give both Agent and Cousin a "midnight release." Austin made all of these statements involving Cousin on the day of the meet-up, and it is hard to ignore the non-fantastical nature of some of these statements. In context, a factfinder could certainly conclude that the statements were intended to convey more than mere fantasy.

¶38 Nor can it be ignored that, throughout the day of the meet-up, Agent often used the plural "we" to refer to himself and Cousin together. Agent told Austin that "*we're* looking for group stuff, so if you don't want to *we* kind of want to find someone who does," and later, that "*we* are both wanting play time." (Emphasis added.) And just before Austin's arrival at the park, Agent texted Austin that there are "townhomes" near the park and that "[*w*]*e* are in those." (Emphasis added.) Austin understood what "we" meant; only hours before showing up to the park, Austin texted Agent, "All I can think about is you *two*." (Emphasis added.)

¶39　Austin makes a similar effort to explain away the condoms, lubricant, and sex toy, arguing that these items corroborate only an intent to engage in lawful activity with Agent, and not illicit activity with Cousin. But for the reasons discussed, we reject this argument. Perhaps Austin could have harbored some secret intent to only use these items on himself or Agent. But given the full scope of the evidence here—including all of the texts and Agent's testimony—there was sufficient evidence to submit to the jury on the question of whether Austin's actions corroborated his intent to sodomize Cousin beyond a reasonable doubt.

CONCLUSION

¶40　For all these reasons, the trial court did not err by denying Austin's motion for a directed verdict based on the sufficiency of the evidence. The State presented sufficient evidence from which a jury could find beyond a reasonable doubt that Austin took a substantial step toward committing sodomy on a child.

¶41　Affirmed.

———————