**2025 UT App 173**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TIMOTHY LAVELL DICKERSON,
Appellant.

Opinion
No. 20230751-CA
Filed November 28, 2025

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 191401450

Douglas J. Thompson, Attorney for Appellant

Derek E. Brown and David A. Simpson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1     This internet-sex-sting case comes before us for a second time. In our first opinion, we reversed the trial court's dismissal of criminal charges—the most serious of which were enticing a minor and two counts of attempted sodomy on a child—against Timothy Lavell Dickerson, and we remanded the case for trial. *See State v. Dickerson*, 2022 UT App 56, ¶ 58, 511 P.3d 1191.

¶2     On remand, the court held a bench trial, and while it acquitted Dickerson on several counts, it convicted him of enticing a minor, one count of attempted sodomy on a child, and possession of drug paraphernalia. Dickerson now appeals the enticement and attempted sodomy convictions, asserting that (a) the court clearly erred when it found that Dickerson

subjectively believed he was chatting with a thirteen-year-old and (b) there was insufficient evidence to support the court's determination that Dickerson took a substantial step toward committing sodomy on a child. For the reasons discussed, we reject Dickerson's arguments and affirm his convictions.

BACKGROUND[1]

¶3    In our first opinion in this case, we set forth a rather fulsome factual background, including large excerpts of the online conversation that occurred between Dickerson and "Kailey," a fictitious online persona created by an agent (Agent) of the Utah Attorney General's Internet Crimes Against Children task force. *See id.* ¶¶ 2–12. In this opinion, we include a shorter summary, and we emphasize only those facts necessary for resolution of the issues before us in this second appeal.

¶4    The online profile Agent created stated that Kailey was eighteen years old. And the profile photo Agent used was a "cropped head shot" of one of Agent's colleagues, a woman in her mid-20s. Agent later acknowledged that the woman in the profile photo did not "look like a 13-year-old girl," because—among other reasons—she appeared to have some wrinkles underneath her eyes. Indeed, Agent agreed that the person in the profile picture "look[ed] older than the age that [Kailey] later represented" to Dickerson.

¶5    One evening, after encountering Kailey's online profile, Dickerson initiated contact, and early in the conversation Kailey

_____

1. "Following a bench trial, we recite the facts from the record in the light most favorable to the findings of the trial court and present conflicting evidence only as necessary to understand issues raised on appeal." *Brown v. Amidan*, 2025 UT App 144, n.2 (cleaned up).

stated that she was "in middle school." Dickerson appeared skeptical of this claim, and he said, "Girl stop," and "Stop play[ing]," and he asked, "So is that really a pic of u[?]" Kailey responded by confirming, several times, that she was in middle school, and she also told Dickerson that the profile photo was indeed of her. Dickerson then asked Kailey how old she was, and Kailey responded by stating that she was thirteen. When Dickerson expressed skepticism, Kailey affirmed that she was "serious" and that she was really thirteen. Dickerson responded by asking Kailey, in effect, what she was doing on the website if she was indeed thirteen ("wyd on here baby"), and Kailey said she was "[l]ooking for whatevs." The conversation continued, with Kailey explaining that she "live[d] in Provo with [her] dad," and with Dickerson eventually asking Kailey if she had "ever been with a black dude." During trial, Agent testified that, in his estimation, "been with" meant having "sex with someone."

¶6 Eventually, Dickerson and Kailey moved their conversation off of the website app and onto text messaging. In one of Kailey's first texts, she explained that her "dad gets really mad when [she's] on the phone late." To this, Dickerson did not reply for almost an hour and a half, nor did Kailey send any other messages during that time. Eventually, Dickerson restarted the conversation, asking if Kailey wanted to "smoke," and later asking, "[W]at else can we do baby[?]" Kailey's responses were hesitant, claiming that she had "never really snuckout" before and that she was "kinda scared" because she was unsure what Dickerson wanted to do and because she had "never been with a oldr guy." Dickerson responded by saying, "Wats the oldest baby and I promise u on my granny I won't hurt or nun." Kailey responded, "[H]e was 13 in my grade." Kailey also told Dickerson that her best friend had an "older boyfriend and she likes it," to which Dickerson responded, "O she do huh and you will like it too baby." Dickerson asked Kailey to share her address so that they could meet up.

¶7      At one point, Kailey asked Dickerson, "[Are] u gonna try stuff with me after we smoke? lol." Thereafter, the following exchange occurred:

Dickerson: Do u want me to baby

Kailey: What will u show me

Dickerson: Wateva u want baby[.] It's up to u[.] I'm just tryin to see wats up cuz it's getting later and later

Kailey: Let meet up tomorrow

Dickerson: Awwwww baby y[.] I wanted to Tonite please

Kailey: I told u i was looking for something like my bff has. [A]nd i really dont know u or what u wanna do

Dickerson: Okay baby and I will give u that I'm tryin to show u just let me show u please[.] I'm down for wateva u want baby[.] That's y I said I can come ova and we can talk about it while we smoke baby

Kailey: I no babe. Just so nervous

Dickerson: Nervous about wat baby

Kailey: If u kiss me and do more

. . . .

Kailey: Ive only kissed like a couple of boys

Dickerson: Ok u never had nobody play wit it or lick it

Kailey: Never

Dickerson: Has ur friend[?] U want to try

. . . .

Dickerson: Do ur friend and her boyfriend do that

Kailey: Yeah

Dickerson: So wats up u want to

. . . .

Dickerson: Do u want to try

Kailey: Lol. Im so lost. Try what

Dickerson: Lick it and play wit it

¶8      Agent testified at trial that, in his estimation, "play with it or lick it" meant "[p]lay with the vagina or lick the vagina." After this exchange, Dickerson promised to "be gentle," and he asked Kailey if "[she] play wit [herself] some times." According to Agent, this question asked whether Kailey masturbated. Kailey responded by saying, "[T]ried but dont know if im doing it right," to which Dickerson said, "Well I'll show you Tonite baby" and "U gon like the way I do it and daddy going to teach u a lot."

¶9      As the conversation progressed, Kailey expressed confusion and nervousness about whether she would get pregnant "if [Dickerson] lick[ed] it and [played with] it." Dickerson insisted she would not get pregnant, and he promised to bring a condom. At this point, Kailey agreed to meet up with Dickerson, and she finally sent him an address in Provo.

¶10    Around 1:00 a.m., Dickerson sent a text stating that he was "on the way," and he asked Kailey to send a picture of herself. Kailey did not do so at that time. But as he drove toward Provo, Dickerson continued texting, and he asked Kailey, "[W]at u got on[?]," to which Kailey responded, "Pink shirt and jeans." Writing back, Dickerson said, "Y u didn't put on tights or a dress something easy[?]" Dickerson also asked, "Can I kiss u[?]" Kailey responded that she "hope[d] so," and at that point the following text exchange ensued:

> Dickerson: Have u ever suck on it before
>
> Kailey: Suck on what
>
> Dickerson: Dick baby
>
> Kailey: Oh never lol
>
> Dickerson: O ok u watch porn
>
> Kailey: I've seen it but don't really watch it
>
> . . . .
>
> Dickerson: U want to learn baby
>
> Kailey: I do
>
> Dickerson: Ok u mine right
>
> Kailey: Yeah I'm yours

¶11    As Dickerson continued his drive, he again asked Kailey to send a picture. This time Kailey complied and sent a selfie-style photo of a woman from the waist up with a filter that smoothed the skin and added a heart nose and bunny ears. Dickerson and Kailey continued to text for more than twenty minutes until

Dickerson arrived at the meeting spot, told Kailey what vehicle he was in, told her to join him, and waited for her. Dickerson was then arrested.

¶12 After Dickerson's arrest, officers searched his vehicle, and they found marijuana and a box of condoms in the back pocket of the front passenger seat. The box of condoms was "brand new" and "unopened," but no receipt or store bag was found to indicate that Dickerson had purchased the condoms that night. Later, Dickerson claimed that he "always [had] condoms" in the car and that he did not bring them for that specific night.

¶13 Following the arrest, Dickerson agreed to speak with Agent. During the interview, the following colloquy occurred:

> Agent: What is your understanding of why we stopped you?
>
> Dickerson: Because I was texting.
>
> Agent: A 13-year-old girl?
>
> Dickerson: Yes, sir.
>
> Agent: You knew that?
>
> Dickerson: Yes, sir.

Dickerson also told Agent that his actions that evening had been "stupid," that he had "four kids," and that he "kn[e]w that" the eldest of which—a daughter—was only "[t]wo years younger than" the persona he thought he was messaging. Dickerson again told Agent, "To be honest with you, I feel stupid even doing it, you know. I don't know what . . . I was doing." At one point, Agent asked the following question: "So if you did meet up with this 13-year-old girl, would you have followed through with [the things that had been discussed?]" And Dickerson responded, "To

be honest with you, my right hand to God, no, sir. That's on my dead grandma. I was talking to her, but at the same time as I was thinking over there I was like man, my kids. . . . I be stupid, you know what I'm saying. . . . This ain't my lifestyle. . . . I ain't that type of person. I ain't no bad guy." He said that, instead of following through with the actions that had been discussed, he was going to tell Kailey, "You're too young. Your parents care about you."[2] And he said he was not going to teach Kailey how to perform oral sex on him, stating, "I couldn't teach a grown woman if a grown woman says I don't know how to do it." Agent later summarized this part of the conversation as Dickerson explaining that "he was just going to go down there and talk some sense into" Kailey.

¶14 Later, the State filed five criminal charges against Dickerson: one count of enticing a minor, two counts of attempted sodomy on a child, one count of possession of a controlled substance with intent to distribute, and one count of possession of drug paraphernalia. After lengthy proceedings, including the first appeal, the case eventually proceeded to a bench trial. During the trial, the State called as witnesses three law enforcement officers, including Agent, who testified about the events described above.

¶15 Dickerson presented no witnesses and chose not to testify in his own defense. In his closing argument, Dickerson's attorney argued that "the State ha[dn't] proven beyond a reasonable doubt that [Dickerson] wasn't just going along with this person purporting to be 13 years old despite not believing it." In addition, he argued that none of the "alleged overt acts" that Dickerson undertook "constitute[d] substantial steps that would show" that

---

2. Both the actual recording of Dickerson's interview, as well as a transcript of that interview, are contained in the record submitted to us on appeal. Where the transcript does not accurately reflect what was said, we have taken the quotations recited here from the actual video recording of the interview.

Dickerson intended to commit sodomy on a child. Specifically, he argued that the statements "pertaining to lick it and play with it" were "ambiguous" and were never specified to have "meant genitals." He also argued that there was never any indication that oral sex would be performed.

¶16 After the trial, the court made a lengthy oral ruling acquitting Dickerson of two of the five charges—the drug distribution charge and one of the two attempted sodomy counts—but convicting him on the other three. The court acquitted Dickerson on the attempted sodomy count related to Dickerson attempting to perform oral sex on Kailey, determining that "the noun for which 'it' stands in [the relevant part of] the conversation [was] never expressly identified" by either Kailey or Dickerson, and that therefore the State had "failed to prove beyond a reasonable doubt that [Dickerson] intended to engage in a sexual act involving his mouth and [Kailey's] genitals."

¶17 But the court convicted Dickerson of enticing a minor, attempted sodomy on a child (related to Dickerson attempting to receive oral sex from Kailey), and possession of drug paraphernalia. With regard to whether Dickerson believed he was chatting with a thirteen-year-old, the court found that Kailey "repeatedly communicate[d] . . . in ways to underscore the fact that [Kailey was] a child. For example, she state[d] that her dad gets really mad when [she's] on the phone late. That she has never really snuck out. That her oldest boyfriend was 13, in [her] grade. That she has never engaged in sexual activities. She expresse[d] ignorance about how one gets pregnant." The court further found that "any lingering doubt about [Kailey's] minority" that might have been present when Dickerson viewed Kailey's original profile photo—which the court found "clearly depicts an adult woman in her mid-20s . . . and not a 13-year-old child"—had been eradicated after Kailey sent the filtered photo "depict[ing] a minor child festooned with floral rabbit ears and a heart nose"; the court held that "[t]his picture clearly does not depict an adult woman."

Finally, and significantly, the court found that Dickerson, in his post-arrest interview, had admitted that he knew he had been "texting with a 13-year-old child."

¶18    And the court made a specific finding that—with regard to receiving oral sex from Kailey—Dickerson had "engaged in conduct constituting a substantial step strongly corroborating his intent to commit the crime of sodomy on a child." The court determined that the facts of this case were "indistinguishable from" the facts of *State v. Smith*, 2024 UT 13, 548 P.3d 874, where the Utah appellate courts affirmed the bindover of a defendant on attempted sodomy charges in an internet-sex-sting case. Particularly, the trial court stated as follows:

> [Dickerson] communicated with a person on the internet who he believed to be a 13-year-old girl. He solicited oral sex from her.
>
> During these communications he repeatedly pressured [Kailey] to disclose her address. When given an out to simply meet tomorrow, he declined, insisting on a meeting tonight. He drove 33 minutes to the prearranged meet location. When he arrived in the area he made contact with [Kailey], parked in the . . . parking lot, as directed, waited for her to come out, and identified the vehicle in which he was driving.
>
> Again the State has proved these facts beyond a reasonable doubt, and as a matter of law they constitute a substantial step strongly corroborative of [Dickerson's] intent to commit sodomy on a child.

¶19    The court later sentenced Dickerson to prison on the enticement and sodomy charges.

ISSUES AND STANDARD OF REVIEW

¶20     Dickerson appeals his convictions for enticing a minor and for attempted sodomy on a child,[3] and he challenges two specific parts of the trial court's ruling. First, as to both convictions, he challenges the court's finding that Dickerson subjectively believed that, during his conversation with Kailey, he was communicating with a person who was thirteen years old. Dickerson challenges that finding as clearly erroneous, and he asserts that the evidence presented at trial was insufficient to support it. Second, as to the attempted sodomy conviction, he challenges the court's finding that he committed a substantial step toward commission of the specific crime of sodomy on a child. As with the first challenge, he asserts that this finding was supported by insufficient evidence. "When reviewing a bench trial for sufficiency of the evidence, we must sustain the [trial] court's judgment unless it is against the clear weight of the evidence, or if we otherwise reach a definite and firm conviction that a mistake has been made." *State v. Holland*, 2018 UT App 203, ¶ 9, 437 P.3d 501 (cleaned up). We must also "grant deference to the trial court on findings of fact and will overturn the [trial] court's findings of fact only if they are clearly erroneous." *State v. Jok*, 2021 UT 35, ¶ 16, 493 P.3d 665 (cleaned up).

ANALYSIS

I.  Dickerson's Belief About Kailey's Age

¶21     First, Dickerson asserts that there was insufficient evidence to support the trial court's finding that, when communicating with Kailey online, Dickerson believed that he was communicating with a thirteen-year-old girl. The State disagrees,

_____

3. Dickerson does not challenge his conviction for possession of drug paraphernalia.

offering its view that the evidence "overwhelmingly showed that Dickerson believed Kailey was only thirteen years old." The State has the better of this argument, because sufficient competent evidence exists to support the court's finding.

¶22 The most compelling evidence on this point is the content of Dickerson's post-arrest interview. In fact, Dickerson's statements during this interview are *by themselves* sufficient evidence to support the court's finding. In that interview, Dickerson responded by stating, "Yes, sir," to questions about whether he had been texting a thirteen-year-old girl and—notably—about whether he "knew that" he had been texting a thirteen-year-old. Moreover, he told Agent that he "kn[e]w that" his own daughter was only "[t]wo years younger than the girl" he'd been texting.

¶23 In addition to these rather striking admissions, later in the interview Dickerson told Agent that he had not actually intended to "follow[] through with" the sexual acts that had been discussed in the online conversation; as support for this contention, he explained that he had driven all the way to Provo only to tell Kailey that she was "too young" to be participating in such acts and that she should not do so because her "parents care about [her]." And in additional statements, he indicated his belief that Kailey was not a "grown woman," telling Agent that he had not intended to teach Kailey how to perform oral sex on him because he "couldn't teach" even "a grown woman" to do so if she did not know how. In the course of making these statements—all of which assumed, as a premise, that Kailey was a young minor—Dickerson did not once claim that he thought Kailey was an adult. Thus, Dickerson's interview statements alone provide ample support for the court's finding that Dickerson fully believed that he had been communicating with a thirteen-year-old girl.

¶24 But other evidence to that effect also exists. During the online conversation, Kailey not only told Dickerson that she was

thirteen, but she also provided details supporting that notion—that she was in middle school, that she lived with her dad, that her dad didn't like it when she was on her phone late, that she would need to sneak out in order to see Dickerson, and that the only boy she'd "been with" was "13 in [her same] grade." Summing up this part of the conversation, the trial court observed that "[t]hroughout the text conversation [Kailey] repeatedly communicate[d] . . . in ways [that underscored] the fact that she [was] a child." And then later in the conversation, Kailey sent Dickerson a decorated photo that—in the trial court's judgment—"clearly [did] not depict an adult woman." All of this evidence, especially when viewed alongside Dickerson's significant admissions during his interview with Agent, overwhelmingly supports the court's finding that Dickerson believed he was communicating with a thirteen-year-old.

¶25 Dickerson resists this conclusion by making two arguments. First, he attempts to explain away some of his interview admissions by pointing out that he is "a black man from the [S]outh" who, when speaking with police, chooses to "respond[] with a healthy dose of deference." From this, he asserts that his "Yes, sir" responses to some of Agent's queries should not be interpreted as admissions to the behavior in question. We certainly understand the point. But interpretation of Dickerson's responses—and the weight they should be given—is a matter for the factfinder, and here, the trial court's interpretation is not unreasonable, especially in context. As already noted, many other statements Dickerson made in the interview—even ones not couched in "Yes, sir" language—indicated his belief that Kailey was thirteen and not an adult. Under these circumstances, we see no reason to second-guess the trial court's interpretation of Dickerson's statements.

¶26 Second, Dickerson points to his initial skepticism of Kailey's claim that she was thirteen and to the fact that Kailey's profile photo—the thing that apparently caused him to initially

take interest in her—clearly depicted an adult woman. In particular, he asserts that, at least during the early part of the conversation, he didn't "believe he was talking with a 13-year-old." And he observes that the trial court found that the profile photo "clearly depicts an adult woman in her mid-20s . . . and not a 13-year-old child." From all this, Dickerson reasons that neither he nor any reasonable person in his position would have believed that Kailey was anything other than an adult. Indeed, he asserts that—after seeing the profile photo and developing initial skepticism—nothing Dickerson saw or heard in the ensuing online conversation (including the later-sent filtered photo) could possibly have disabused Dickerson of his initial skepticism. As he puts it, because "the first and second pictures are [of] the same person, when considered together, no reasonable person could conclude that the person in both pictures was 13 years old."

¶27　But the question isn't whether a reasonable person in Dickerson's position believed Kailey was thirteen; instead, the question is whether *Dickerson* believed she was thirteen. *See* Utah Code § 76-4-101(3)(b) (phrasing the relevant question, regarding the attempt charge, as whether "the attendant circumstances had been as *the actor believed them to be*" (emphasis added)); *id.* § 76-4-401(2)(b)(i) (2018)[4] (phrasing the relevant question, regarding the enticement charge, as whether "*the actor believes*" the person "to

--------

4. This statute was amended and renumbered after the events involving Dickerson occurred. *Compare* Utah Code Ann. § 76-5-417 (LexisNexis Supp. 2025), *with id.* 76-4-401 (Supp. 2018). We cite the previous version of the statute in the text because it was the version in effect at the time of the events in question in this case. And we elect to cite the 2018 version of the statute, rather than the 2019 version, because the 2019 version went into effect on the same day that some of the events in question here took place and because there are no substantive differences between the 2018 and 2019 versions of the operative statutory language.

be a minor" (emphasis added)). And based on the entire online conversation and the statements Dickerson made in his post-arrest interview, he quite clearly did. Exactly how Dickerson squared this belief with his apparent initial skepticism is not entirely clear from the record, but it is ultimately immaterial. Perhaps he believed that the initial profile photo was actually *not* of Kailey, or was itself doctored to provide cover for a thirteen-year-old's participation on an adult dating website. *See State v. Dickerson*, 2022 UT App 56, ¶ 50, 511 P.3d 1191 (observing, on the facts of this case, that a reasonable factfinder "could easily" conclude "that Dickerson believed Kailey was a minor who had falsely certified her age and posted an adult's photograph to circumvent the dating app's 'adults only' policy"). Or perhaps he was entirely persuaded by Kailey's statements and explanations during the conversation. But the evidence is quite strong that— however he got there—Dickerson eventually came to espouse the belief that he was communicating with a thirteen-year-old girl.

¶28 Accordingly, the trial court's finding regarding Dickerson's subjective belief about Kailey's age was supported by ample evidence and is therefore not clearly erroneous, nor is it against the clear weight of the evidence. On this basis, we reject Dickerson's first challenge.

## II. Substantial Step Toward Commission of Sodomy on a Child

¶29 Second, Dickerson challenges the court's determination that he had undertaken a "substantial step" toward commission of the specific crime of sodomy on a child. The State argues that the "evidence easily constitute[s] a substantial step" because Utah's appellate courts "have repeatedly affirmed attempt convictions on materially identical facts." We agree with the State.

¶30 Here, Dickerson was charged with attempting to commit sodomy on a child. Under Utah law in effect at the time of the

events in question, a person commits sodomy on a child "if the actor engages in any sexual act upon or with a child who is under the age of 14, involving the genitals or anus of the actor or the child and the mouth or anus of either person, regardless of the sex of either participant." Utah Code § 76-5-403.1(1) (2018).[5]

¶31    Utah's attempt statute instructs that "a person is guilty of an attempt to commit a crime if he: (a) engages in conduct constituting a substantial step toward commission of the crime; and (b)(i) intends to commit the crime." *Id.* § 76-4-101(1) (2025). In this context, our legislature has determined that "conduct constitutes a substantial step if it strongly corroborates the actor's mental state." *Id.* § 76-4-101(2). Thus, the "substantial step" element and the "intent" element are "closely linked." *State v. Austin*, 2025 UT App 51, ¶ 23, 568 P.3d 1107 (cleaned up). Our supreme court, in interpreting the attempt statute, has explained that a substantial step requires "significant conduct" in the form of an "overt act." *State v. Arave*, 2011 UT 84, ¶ 30, 268 P.3d 163 (cleaned up). And that act must be "something more than mere preparation"; it must be "a tangible step toward commission of a crime that transcends intent, yet fails to culminate in its planned accomplishment." *Id.* (cleaned up). But that act "need not be the last act necessary to commit the crime." *State v. Washington*, 2021 UT App 114, ¶ 13, 501 P.3d 1160 (cleaned up).

¶32    Thus, in order to obtain a conviction in this case, the State was obligated to prove, beyond a reasonable doubt, that Dickerson had taken a substantial step—that is, significant conduct in the form of an overt act that strongly corroborated his intent—toward committing a sexual act that involved both

---

5. This statute has also been amended since Dickerson was charged. *See* Criminal Code Recodification, ch. 181, § 86, 2022 Utah Laws 1125, 1180. The basic elements of sodomy on a child have not materially changed, but we cite the previous version of the statute in the text.

(a) either his own or Kailey's genitals and (b) either his own or Kailey's mouth. And it is important to point out here that, because the trial court acquitted Dickerson of the sodomy count involving his alleged attempt to perform oral sex on Kailey, the sexual act relevant to the count on which Dickerson was convicted at trial involves Kailey potentially performing oral sex on Dickerson. Here, the State was obligated to prove that Dickerson had taken a substantial step toward commission of that specific sexual act.

¶33 At the conclusion of the bench trial, the court found that Dickerson had taken such a step. It found that, during the online conversation, Dickerson had "solicited oral sex from" Kailey and that he drove to Provo "to the prearranged meet location" in anticipation of Kailey performing that particular sexual act. The court summed up its ruling by noting that "the State ha[d] proved these facts beyond a reasonable doubt, and as a matter of law they constitute[d] a substantial step strongly corroborative of [Dickerson's] intent to commit sodomy on a child." Dickerson challenges this determination, but in our view there is ample evidence to support it, particularly when comparing the factual circumstances here with controlling caselaw.

¶34 Recently, our supreme court decided *State v. Smith*, 2024 UT 13, 548 P.3d 874, a case that provides helpful guidance in determining whether a substantial step occurred in cases like this one. There, the court held that the defendant had taken a substantial step toward the commission of various sex crimes, including sodomy on a child, when he showed up to a designated meeting place after arranging to have oral sex and intercourse with an undercover agent posing as a thirteen-year-old girl. *Id.* ¶¶ 14–33. The agent had created a profile on a mobile messaging app, and after a series of text messages between the defendant and the agent over the course of three hours, the defendant eventually agreed to drive the fictitious girl from Utah to California in exchange for oral and vaginal sex. *Id.* ¶¶ 3–6. The two were to meet at a convenience store, the defendant would flash his lights

to signal where his car was located, and soon after driving away together, the girl would perform oral sex on the defendant. *Id.* ¶¶ 6, 29. The defendant drove to the store, texted his location to the girl, told her to get into his car, and flashed his lights. *Id.* ¶¶ 6–7. The defendant was then arrested. *Id.* ¶ 7.

¶35    These actions, the court held, "strongly corroborate[d] [the defendant's] intent to commit" the charged crimes. *Id.* ¶ 29.[6] The court explained that the text messages "ma[de] it clear that he agreed to give [the girl] a ride to California only because she promised to perform sex acts, oral sex among them." *Id.* ¶ 30. As for whether the defendant's actions constituted a substantial step, the court explained that while "[t]here are certainly many reasons why someone would drive to a convenience store, . . . [the defendant] drove to the arranged store, at the arranged time, and gave the arranged signal," and "[t]here is no plausible reason why he would [have] do[ne] so other than to carry out the arranged plan." *Id.* ¶ 29. The court concluded that the defendant's actions corroborated his intent to commit sodomy on a child. *Id.* ¶ 30.

¶36    Even more recently, this court decided *State v. Austin*, 2025 UT App 51, 568 P.3d 1107. In that case, an undercover agent created a dating "profile for a fictional twenty-five-year-old male" who was looking for someone to participate in sexual acts with him and his fictional thirteen-year-old male cousin. *Id.* ¶¶ 2–3. The defendant engaged in a days-long text conversation with the agent "involving discussion of specific acts that fall within the ambit of the statutory definition of sodomy on a child." *Id.* ¶ 27. "And like the defendant in *Smith*, [this defendant] drove to a designated meet-up location where he anticipated facilitating a sexual encounter with a child." *Id.* Once the defendant arrived at

---

6. Although the supreme court analyzed the child kidnapping statute in this part of the opinion, it later stated that "[t]he same logic governs our analysis of the crime of attempted sodomy upon a child." *State v. Smith*, 2024 UT 13, ¶ 30, 548 P.3d 874.

the meeting location, he was arrested; officers located "condoms, sexual lubricant, and a sex toy" in his possession. *Id.* ¶¶ 14–15. On these facts, a jury convicted the defendant of attempted sodomy on a child, and we rejected his sufficiency-of-the-evidence challenge on appeal. *Id.* ¶¶ 19, 30, 40. We stated that, "viewed against the backdrop of [the] text-message conversation, [the defendant's] arrival at the park went beyond mere preparation for the crime and amounted to significant conduct in the form of an overt act." *Id.* ¶ 28 (cleaned up).

¶37 Like the defendants in *Smith* and *Austin*, Dickerson committed a series of overt acts that strongly corroborated his intent to commit sodomy on a child, and we agree with the trial court that the facts of this case are materially "indistinguishable" from those in not only *Smith* but also *Austin*. In this case, the State presented text messages in which Dickerson "solicited oral sex from" Kailey by specifically inviting her to "[s]uck on" his "[d]ick." In the course of that same conversation, Dickerson convinced Kailey to provide him with an address at which they could meet, then drove some "33 minutes" to that location. During the drive, he continued to text Kailey, asking her (among other things) what she was wearing and whether she watched pornography. As in *Smith*, there is "no plausible reason why" Dickerson would drive to the prearranged meeting location, at the arranged time, while messaging Kailey about sexual acts "other than to carry out the arranged plan." *See* 2024 UT 13, ¶ 29. This evidence amply supports the trial court's finding that Dickerson had taken a substantial step toward committing the specific crime of sodomy on a child.

¶38 Dickerson resists this conclusion by arguing several points. First, he attempts to distinguish *Smith* on procedural grounds, pointing out that *Smith* involved a bindover determination following a preliminary hearing, whereas this case involves a sufficiency-of-the-evidence challenge following a full trial. But we rejected this exact argument in *Austin*, stating that, "despite the

procedural differences between [*Austin*] and *Smith*, in our view *Smith* [was] still useful . . . to illustrate the sort of activity that can constitute a 'substantial step' toward commission of a crime in internet sting cases." *Austin*, 2025 UT App 51, ¶ 33.

¶39   Second, Dickerson attempts to distinguish *Smith* by pointing out that, in *Smith*, "the expectation was that oral sex would occur as soon as they started driving," whereas in this case "there were many steps remaining" after Dickerson's arrival at the meet-up location before any sexual contact was to occur. For instance, Dickerson points out that he and Kailey had discussed that they would smoke first and see how the evening went, before deciding which (if any) sexual acts they would engage in. He acknowledges that there was "innuendo and sexual implication," but he insists that there was not enough "causal proximity" between his arrival at the meet-up location and eventual commission of acts constituting sodomy. But we rejected a similar argument in *Austin* on similar facts. *See id.* ¶¶ 34–35. And as we have already noted, a substantial step can be taken even if other additional actions need to occur for the crime to be completed. *See State v. Washington*, 2021 UT App 114, ¶ 13, 501 P.3d 1160 (stating that the actions constituting the substantial step "need not be the last act necessary to commit the crime" (cleaned up)).

¶40   Third, Dickerson points to a statement this court made in *State v. Ansari*, 2004 UT App 326, 100 P.3d 231, and he asserts that his conduct in this case can amount only to enticement of a minor and not attempted sodomy on a child. In *Ansari*, we suggested—in dicta—that "enticement" charges "would be more appropriate in a case where . . . a defendant solicits sex from an undercover police officer on the Internet" and where there is no actual victim, whereas attempt charges would be more "appropriate" if the defendant contacts an actual minor "via the Internet, meet[s] the minor, and [is] on the verge of consummating a felonious sexual act." *Id.* ¶¶ 19–20. We acknowledge Dickerson's point, and we imagine that prosecutors, as a matter of course, carefully consider

whether, in the interest of justice, cases like this one should be charged as enticement crimes rather than attempt crimes. But the fact of the matter is that some internet-sex-sting cases can be charged either way, and our statement in *Ansari*—especially in light of our supreme court's recent guidance in *Smith*—should not be read as an indication that such cases can be charged *only* as enticement cases. To be sure, a prosecutor who charges the more serious crime bears a higher evidentiary burden, and by raising a sufficiency-of-the-evidence challenge, Dickerson has put at issue the question of whether the State carried that burden here. But so long as that burden is met, internet-sex-sting cases can result in convictions for attempt crimes.

¶41    Finally, Dickerson points out that he and Kailey did not specifically discuss her performing oral sex on him until *after* he had already begun his drive to Provo. He therefore posits that any steps he took prior to sending those specific text messages cannot count as steps toward commission of the specific crime of sodomy on a child. But even assuming—for purposes of the discussion only, and without deciding—that this assertion is correct, Dickerson still committed significant overt acts *after* those text messages were sent. At that point, he was only about ten minutes into his 33-minute drive; after those texts, he completed the bulk of the drive to the meet-up location. And during those last twenty minutes of driving, he asked Kailey if she still "want[ed] to learn"; he asked her to send another picture, and she sent the filtered photograph; he arrived at the meet-up location; he told her what kind of vehicle he was driving; and he invited her to come out and meet him in his vehicle. These acts are enough to constitute a substantial step. *See Austin*, 2025 UT App 51, ¶ 35 (noting that the "overwhelming majority of courts in other jurisdictions . . . have concluded that individuals caught in internet sex stings, and who travel to an agreed-upon meeting place in anticipation of sexual

behavior with a fictitious victim, have taken a substantial step toward commission of sexual crimes" (cleaned up)).[7]

CONCLUSION

¶42 Sufficient evidence supported the trial court's factual findings that Dickerson believed he was communicating with a thirteen-year-old girl and that Dickerson took a substantial step toward commission of the specific crime of sodomy on a child. Accordingly, we reject Dickerson's appellate arguments and affirm his convictions.

———————

7. Dickerson also presents another argument: that the trial court committed legal error by stating that the proven facts of the case "constitute a substantial step" toward commission of sodomy on a child *as a matter of law.*" (Emphasis added.) In our view, Dickerson overreads (or misinterprets) the court's comments. As we read those comments, the court was merely intending to state that the facts that it had found, beyond any reasonable doubt, to have occurred constituted a substantial step toward commission of the charged crime. The court had just finished stating that, in its view, the "facts proved here beyond a reasonable doubt are indistinguishable from those in *Smith*." If a court finds certain facts to be true and then determines those facts to be indistinguishable from the facts of a recent Utah Supreme Court case, it is understandable that the court would feel like the conclusion was mandated "as a matter of law." In any event, we do not perceive the court's comments as an indication that it misunderstood the relevant legal standard. And even if it had, that error would be harmless here in any event, because it would simply mean that the court found the case even more convincing than it needed to be in order to support a conviction. Under the circumstances, we need not discuss this argument further.